IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

STATE OF NEW MEXICO *ex rel.*
State Engineer, *et al.,*

        Plaintiffs,

v.

JOHN ABBOTT, *et al.,*

        Defendants.

68cv7488 BB
Rio Santa Cruz Adjudication

and

70cv8650 BB
Rio de Truchas Adjudication

Consolidated

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Acequia del Llano de Abeyta's Objections to Special Master Report (Doc. No. 2854, filed October 26, 2010). For the reasons stated below, the Acequia del Llano de Abeyta's Objections will be **SUSTAINED in part** and **OVERRULED in part**.

**Background**

This matter concerns the priority date of one of the five acequias in the Truchas land grant. Determination of the priority date requires that the Court consider the geographic location of the acequia with respect to the western boundary of the Truchas land grant, the town of Truchas, two roads, each of which are referred to as "camino real," the town of Peñasco and Picurís Pueblo.

The town of Truchas is located in northern New Mexico within the Nuestra Señora del Rosario San Fernando y Santiago land grant ("the Truchas land grant"). (*See* Deposition of Stanley V. Hordes, Vol. II, Ex. 16). The Truchas land grant extends approximately 10 miles east to west and varies in width north to south from approximately 1.5 to 4 miles. (*See id.*). The town of Truchas is located approximately two miles east of the western boundary of the land grant. The Rio de Truchas flows westward along the northern boundary of the land grant. Peñasco is located about

15 miles northeast of the town of Truchas and Picurís Pueblo is located about 2 miles northwest of Peñasco.

Five acequias distribute water from the Rio de Truchas to irrigate land in the Truchas land grant. (*See* Hordes Dep. Vol. II, Ex. 16). The Acequia Madre, the Acequia del Llano and the Acequia de la Posesion divert water from the Rio de Truchas east of the town of Truchas. These three acequias flow westward and provide irrigation water for lands located at and east of the town of Truchas. (*See id.*). The Acequia Madre flows westward through the town of Truchas and discharges water to the Acequia del Llano de Abeyta and the Acequia de los Llanitos, both of which provide irrigation water for lands located west of the town of Truchas. (*See id.*).

The Special Master recommended the following priority dates for the five acequias:

> 1752 for the Acequia Madre;
> 1829 for the Acequia del Llano;
> 1852 for the Acequia de la Posesion;
> 1874 for the Acequia de los Llanitos; and
> 1882 for the Acequia del Llano de Abeyta.

(Special Master's Report at 24-25, Doc. No. 2728, filed April 2, 2010). In recommending priority dates for the five acequias, the Special Master "relied heavily on Dr. Baxter's Report, his interpretations of relevant documents, and his statements during depositions." (Special Master's Report at 5-6). Dr. Baxter is the court-appointed expert witness. (*See* Baxter Dep. Vol. I at 3:19-21). Dr. Baxter established the priority for each acequia based on the earliest report of water use he was able to find in historical documents. (*See* Baxter Dep. Vol. I at 19:17-19).

The Acequia del Llano de Abeyta ("Abeyta")[1] objected to the Special Master's Report arguing that the Court should reject the 1882 priority date recommended for Acequia del Llano de

---

[1]The Court will use "Acequia del Llano de Abeyta" to refer to the ditch that conveys the water and "Abeyta" to refer to the association that governs the use of the ditch.

Abeyta and assign Acequia del Llano de Abeyta the same priority date as the Acequia Madre, i.e. 1752. (*See* Abeyta's Objections at 26-27, Doc. No. 2854, filed October 26, 2010). Abeyta argues in the alternative that the Court should assign Acequia del Llano de Abeyta a priority date no later than 1800. (*See id.*).

Abeyta contends that "the Court should exercise its discretion to conduct an evidentiary hearing, at which live testimony of Dr. John Baxter and Dr. Stanley Hordes may be presented." (Objections at 2). The Court must decide *de novo* all objections to findings of fact and conclusions of law recommended by a Special Master. *See* Fed. R. Civ. P. 53(f). The Court has reviewed the 28 volumes of depositions and the more than 100 exhibits submitted by the parties on this matter. For those exhibits that are in Spanish, the Court has looked to the translations offered by the parties. The Court understands Abeyta's arguments, but does not believe that a hearing is warranted. *See Commissariat À L'Energie Atomique v. Samsung Electronics Co.*, 245 F.R.D. 177, 179 (D. Del. 2007) ("The plain language of Rule 53 shows that the review of a Special Master's decision requires the court to make a *de novo determination*, not conduct a *de novo hearing*") (*emphasis in original*). Abeyta's request for an evidentiary hearing is denied.

**Priority Date for the Acequia Madre**

The Acequia Madre diverts water from the Rio de Truchas, flows westward, and provides irrigation water for the land at and near the town of Truchas. Dr. Baxter established a priority date of 1752 for the Acequia Madre based on reports of irrigation at Truchas two years before the award of the land grant in 1754. (*See* Baxter Dep. Vol. IV, Ex. 15 at 1, 24, dated April 1, 1997 ("Baxter Report")).

According to Dr. Baxter, irrigation in the Truchas area began in 1752 when a group of families constructed an irrigation ditch and planted crops in the area. (Baxter Report at 1). Two

years later Governor Tomás Vélez Cachupín authorized a land grant for those families. (*See id.*). Alcalde Juan José Lovato established the exterior boundaries of the land grant and measured farmlands for each family head. (*See id.*). Lovato established "the road that goes to Picurís" as the western boundary of the land grant. (*Id.* at 2). "Lovato began the allocation [of farmlands] at the camino real and proceeded eastward, marking off tracts of 150 varas[2] for each of the fourteen settlers as he proceeded eastward. After completing the first allotment, he repeated the process, giving each grantee an additional 150 varas." (*Id.*).

Dr. Baxter believes that the allocation began at the Camino Picurís which is located approximately one-half mile west of the town of Truchas. (*See* Baxter Dep. Vol. IV at 7:8-17; Baxter Dep. Vol. I, Ex. 3; Hordes Dep. Vol. II, Ex. 16). The allocated farmlands extended from approximately one-half mile west of the Town of Truchas to approximately 1.7 miles east of the town of Truchas. (*See* Baxter Dep. Vol. III at 293:10-19). Thus, according to Dr. Baxter, the westernmost allocated farmlands were approximately one and a half miles east of the western boundary of the land grant. (*See* Hordes Dep. Vol. II, Ex. 16).

**Priority Date for the Acequia del Llano de Abeyta**

The Acequia del Llano de Abeyta begins approximately one-half mile west of the town of Truchas and flows westward approximately one and a half miles to the western boundary of the Truchas land grant. The Acequia del Llano de Abeyta provides irrigation water for lands in El Llano de Abeyta which is located between the town of Truchas and the western boundary of the Truchas land grant. Dr. Baxter established a priority date of 1882 for the Acequia del Llano de Abeyta based on a notice of possession filed in 1887 in which the claimant stated he had been in possession of the land, located west of Truchas in El Llano de Abeyta, for five years. (*See* Baxter Dep. Vol. I at

---

[2]A "vara" is a length of about 33 inches. (*See* Baxter Dep. Vol. II at 111:22-112:2).

4

14:20-16:5; Baxter Report at 10-11).  The Special Master recommended that the Court assign the Acequia del Llano de Abeyta a priority date of 1882 based on Dr. Baxter's opinion.

Abeyta's objection to the Special Master's recommended priority date of 1882 is based on its disagreement with Dr. Baxter's opinion regarding where the allocation of farmlands began. Abeyta's expert, Dr. Hordes, opined that "the western boundary of the Truchas Grant, described in the April 24, 1754 Act of Possession as the 'Camino Real que ba para Picurís,' was the beginning point for the distribution of farmlands, the said distribution extending eastward through the Llano de Abeytia [sic]." (Hordes Dep. Vol. III, Ex. 1 at 2 ("Hordes Report")). Abeyta contends that because the land allocation in 1754 began at the western boundary of the land grant and proceeded eastward, there was farming and irrigation in El Llano de Abeyta in 1752 and, consequently, the Acequia del Llano de Abeyta is entitled to the 1752 priority date. (*See* Objections at 4-6).

<b>DISCUSSION</b>

Abeyta makes several arguments that the Acequia del Llano de Abeyta should have a priority date earlier than that recommended by the Special Master. First, Abeyta contends that there was only one road, or "camino real," to Picurís which was both the the western boundary of the Truchas land grant and the starting point for the land allocation. Second, Abeyta disagrees with Dr. Baxter's opinion, that practical concerns suggest that the land allocation did not begin at the western boundary of the land grant, because language in the Act of Possession indicates that the allocated parcels of land were not contiguous. Abeyta also argues that statements of ownership known as *titulos* demonstrate that the Llano Abeyta lands were cultivated long before the 1882 priority date recommended by the Special Master. Finally, Abeyta contends that the Cordoba deed reflects cultivation of Llano Abeyta no later than 1854. The Court is not persuaded by Abeyta's first three arguments, but agrees that the Cordoba deed supports a priority date of 1854.

5

**Two References to "Camino Real"**

Both experts, Dr. Baxter and Dr. Hordes, rely on the 1754 Act of Possession to support their opinions. The Act of Possession mentions "camino real" twice, the first time with regard to the western boundary of the land grant and the second with regard to the starting point for the land allocation, but it is not clear to the Court that both references to "camino real" refer to the same location. The first reference identifying the western boundary of the land grant reads, according to Dr. Hordes, "Camino Real que ba para Picurís." (Hordes Report at 12). Two translations of the Act of Possession translate the first reference as "the main road that leads to Picuris," and "the highway leading to Picuris." (Ex. A-5 (the exhibit indicates the translations were completed in or by 1892); Doc. No. 2190 at 9, filed July 28, 1998 (stating that the translations were prepared for use by the Court of Private Land Claims)). The second reference regarding the land allocation is in a phrase that appears to read "Camino Real para arriva." (Hordes Dep. Vol. II, Ex. 9). The two translations of the Act of Possession translate the second reference as "the main road" and "the high road." (Ex. A-5).

Dr. Baxter opined that the Act of Possession referred to two roads as "camino real" where "one Camino Real formed the western boundary of the grant, and another Camino Real was the starting point for the land distribution." (Baxter Dep. Vol. IV at 7:18-8:12). Dr. Baxter testified that "camino real" means "public road" and that it would not be unusual for "there to have been more than one road called 'Camino Real' at any given place, such as Truchas, at one given time." (Baxter Dep. Vol. III at 294:12-15; Baxter Dep. Vol. IV at 8:13-16). Abeyta does not offer an explanation why the Act of Possession refers to one road with two different phrases.

Abeyta argues that there were not two roads to Picurís. Abeyta argues that "a sketch of the grant included in the 1892 translation of the land grand documents does not depict two roads to

6

Picuris, but rather only depicts the road at the western boundary of the grant, the main road to Picuris." (Objections at 8). The sketch included in Exhibit A-5 is a rough, hand-drawn map, approximately three inches by one and a half inches, which represents an area approximately 14 miles by 7 miles, and is largely illegible. Based on its comparison of the sketch with the U.S. Geological Survey topographic map (*See* Hordes Dep. Vol. II, Ex. 10), the Court finds that the scale and accuracy of the sketch makes it an unreliable indicator of the absence of a second road near the town of Truchas.

Abeyta also points to the U.S. Surveyor General map of the Truchas land grant (Ex. A-8, surveyed in 1895) as evidence that there was no second road to Picurís. (*See* Objections at 8). The 1895 survey shows the "Road to Picuris" along the western boundary of the land grant and another road running north from the town of Truchas labeled "Peñasco Wagon Road." (Ex. A-8). Abeyta concludes that "there was only one road to Picuris (the "Main Road to Picuris" forming the western boundary of the grant) and, by at least 1895, another road to Peñasco." (Objection at 8).

Dr. Baxter contends that there was a second road to Picurís near Truchas no later than 1752. (*See* Baxter Report at 37). Dr. Baxter notes that "many of the prospective [Truchas] grantees resided in Pueblo Quemado [south of Truchas], requiring travel" northward to Truchas and Picurís. (*Id.*). A direct route northward through Truchas to Picurís would have avoided a long detour to the road on the western boundary of the land grant. (*See id.*).

After considering Dr. Hordes testimony regarding the location of the "Main Road to Picuris," which forms the western boundary of the land grant, and the locations of Picurís and Peñasco relative to the town of Truchas, the Court finds Dr. Baxter's opinion that there were two roads to Picurís persuasive. During his deposition Abeyta's expert, Dr. Hordes, showed the location of the Camino Real at the western boundary of the land grant extending northeastward until it intersects

7

and then follows the current highway running northward from the town of Truchas. (*See* Hordes Dep. Vol. II at 305:24-306:5, Ex. 10). The two roads merge at a point approximately two miles northeast of the town of Truchas. The current highway then continues northeastward approximately eight miles to a point about midway between Picurís and Peñasco. Thus, it appears that one could travel to both Picurís and Peñasco either by starting at the "Main Road to Picuris" at the western boundary of the land grant or by starting at the "Peñasco Wagon Road" near the town of Truchas.

**Contiguous Land Allocation**

Dr. Baxter states that practical concerns support his conclusion that the land allocation began at the Camino Picurís approximately one-half mile west of the town of Truchas and proceeded eastward. Beginning land allocations at Camino Picurís and proceeding eastward would result in farmlands on both the west and east sides of Truchas which "would have provided for efficient use of the acequias and maximum protection from Indian attacks." (Baxter Report at 38). Dr. Baxter states that "[i]f the lands allocated were adjoining, as was customary for grant allotment of [t]his kind in Spanish Colonial New Mexico, the entire distribution of 4,200 varas (about 2.2 miles) would have failed to reach the Truchas plaza from the grant's west boundary." (Baxter Report at 36-37). Abeyta's expert testified that adjoining allotments beginning from the western boundary of the land grant would extend "probably just to or just beyond the town of Truchas." (Hordes Dep. Vol. I at 39:4-12).

Abeyta argues that the allocated lands were not adjoining. Dr. Hordes testified that in the document approving the grant the governor instructed the alcalde to make grants of land to each family of the "same quality and quantity." (Hordes Dep. Vol. II at 191:8-192:3). Meeting the "same quality and quantity standard" would require "skip[ping] over the less appropriate farmland and then mov[ing] on to another piece of land farther up river that might be more suitable." (Hordes Dep.

8

Vol. I at 12:23-13:7). Dr. Hordes concluded that with non-contiguous distribution, the allocated lands would have extended "possibly another half mile, three-quarter mile" past the town of Truchas. (Hordes Dep. Vol. 1 at 39).

Dr. Baxter, however, testified that it "would be highly unusual" that the allotments would be discontinuous, i.e. with vacant land between the allotted tracts. (Baxter Dep. Vol. III at 172:6-11). Abeyta's theory of discontiguous distribution of lands would require a ditch a little over five miles long with only a little over two miles of it used to irrigate lands. (*See* Hordes Dep. Vol. II at 267:12-15). Dr. Hordes testified that under this theory there were lands on the Llano de Abeyta that lay fallow for about 75 years. (*See id.* 267:24-268:3). Dr. Baxter opined that it is unlikely that lands that were irrigable by an existing acequia would be left unirrigated and fallow for a period of 75 years. (*See* Baxter Dep. Vol. III at 177:8-13). Dr. Hordes was unable to cite any other examples in northern New Mexico where arable land lay fallow for 75 years where there was irrigation water available. (*See* Hordes Dep. Vol. II at 268:4-8). Dr. Hordes also could not cite any examples of a noncontiguous distribution of land in an act of possession. (Hordes Dep. Vol. II at 291:19-25).

***Titulos***

Abeyta argues that *titulos* filed under an 1884 Act demonstrate longstanding occupancy and cultivation of the Abeyta area. (*See* Objections at 15). In 1884, the New Mexico legislature enacted a law that allowed "persons who had acquired real estate by purchase or otherwise, but lacked evidence of title, to record a statement of ownership with county officials." (Baxter Report at 39). Between 1887 and 1889 thirty-one persons filed such statements, which are known at *titulos*, for land located west of the town of Truchas in the Llano de Abeyta area. (*See id.*; Special Master's Report at 7). Abeyta contends that the "individual who filed them were seeking to obtain proper title to lands that had long been possessed and cultivated by their predecessors [thus] provid[ing] further

support for the fact that Llano Abeyta was cultivated many years before the priority date recommended by the Special Master." (Objections at 15). Abeyta's argument is based on its expert's opinion that some *titulos* holders "can be traced back to original grantees through genealogical records." (Hordes Revised Report at 10, Ex. A-31). Dr. Baxter noted that evidence that an owner's predecessors had owned or occupied the land is not evidence that those predecessors farmed or cultivated the land and, consequently, is not evidence of water use. (*See* Baxter Dep. Vol. IV at 19:6-25).

**Cordoba Deed**

Finally, Abeyta argues that the 1854 Cordoba[3] deed "reflects cultivation of Llano Abeyta no later than 1854, given that it reflects the existence [of] the Acequia de los Garcias in the Llano Abeyta." (Objections at 16-19). The deed for a parcel of land purchased by Pedro Cordoba in 1854 indicates that the parcel was "subject to the Acequia de los Garcias." (Baxter Report at 19, 28). "Later documentation has shown the Garcia ditch to be a lateral from the Acequia del Llano Abeyta." (*Id.* at 28). Based on the Cordoba deed, Dr. Baxter concluded that "1854 can be regarded as a defensible priority for the Acequia de los Garcias." (*Id.*).

**Conclusion**

The Court has spent considerable time and effort resolving this issue which was difficult due to the long passage of time since the establishment of the Truchas Land Grant and the minimal amount of contemporaneous evidence of the first use of water across the Truchas Land Grant. Despite the difficulty, the Court must make a determination of the priority date for the Acequia del Llano de Abeyta. *See* N.M. Stat. Ann. § 72-4-19 (final decree must declare the priority date). Because the Court may not speculate, it must base its determination of the priority date on the

---

[3]Dr. Baxter spells the name "Cordova." (*See* Baxter Report at 28).

available evidence, no matter how little evidence there may be. *See Daniels v. Twin Oaks Nursing Home*, 692 F.2d 1321, 1324 (11th Cir. 1982) (inference is not reasonable if it is only a guess or a possibility).

Here the issue is whether the land allocation began at the camino real which forms the western boundary of the Truchas Land Grant or at a camino real located in the middle of the land grant near the Town of Truchas. Both the Special Master and Abeyta rely on the 1754 Act of Possession to support their proposed priority dates. The Court has reviewed the 1754 Act of Possession in Spanish and two subsequent English translations prepared for the Court of Claims, all of which indicate different names for the camino real along the western boundary and the location where the land allocation began. Two different names suggests two different locations and, therefore, supports the Special Master's recommendation.

Dr. Baxter's testimony, that contiguous allocations in land grants was customary, promoted efficient use of the acequias and provided maximum protection from Indian raids, and that a road northward from Pueblo Quemado (located south of the Town of Truchas) through Truchas to Picurís (located north of the Town of Truchas) would have avoided a long detour around the western end of the land grant for people traveling from Pueblo Quemado to Truchas and Picurís, corroborates the conclusion that the land allocation began at a camino real near the Town of Truchas. Abeyta's argument that there was only one camino real and that land allocation began at the western boundary of the land grant requires that the land allotments would be discontinuous and would require a ditch a little over five miles long with only a little over two miles of it used to irrigate lands. However, Abeyta's expert, Dr. Hordes, did not cite any examples of noncontiguous distribution of land in an act of possession or any examples in northern New Mexico where arable land lay fallow where there was irrigation water available.

11

The Court must determine whether the land allocation began at the western boundary of the land grant or at a location closer to the Town of Truchas, a difficult task given the relatively little amount of evidence available, which is not surprising given that the land allocation occurred over 250 years ago. The Court begins with the Act of Possession, a document drafted contemporaneously with the land allocation and which on its face indicates that the land allocation began at a location different from the western boundary of the land grant. Dr. Baxter's testimony corroborates the determination that the land allocation did not begin at the western boundary of the Truchas land grant but instead began at a location near the Town of Truchas. While the possibility remains that the land allocation began at the western boundary of the land grant, Abeyta has not offered sufficient corroborating evidence which would make such a determination more than a guess. The Court concludes that the 1754 land allocation did not begin at the western boundary of the land grant, but instead began approximately one-half mile west of the town of Truchas. Consequently, Abeyta has not shown that water use in the Llano Abeyta began in 1752.

Abeyta has persuaded the Court that it is entitled to a priority date earlier than that recommended by the Special Master, but not as early as requested by Abeyta. Abeyta argued that some *titulos* holders could trace their ownership back to the original grantees in 1754. However, evidence that an owner's predecessors previously owned or occupied the land is not evidence that those predecessors used water on those lands. Abeyta points out, and the Court agrees, that the 1854 Cordova deed "reflects cultivation of Llano Abeyta no later than 1854, given that it reflects the existence of" a lateral of the Acequia del Llano de Abeyta. The Court finds that the Acequia del Llano de Abeyta is entitled to a priority date of 1854, which the Court's expert, Dr. Baxter concluded "can be regarded as a defensible priority date [for the lateral]."

The Court will overrule Abeyta's objection that the Acequia del Llano de Abeyta should

have a priority date of 1752.  The Court will sustain Abeyta's objection that the Acequia del Llano

de Abeyta should have a priority date no later than 1854 based on the Cordoba deed.

**IT IS SO ORDERED.**

_____

**MARTHA VÁZQUEZ**
**UNITED STATES DISTRICT JUDGE**


Approved:

_____
Lorenzo F. Garcia
United States Magistrate Judge